**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| AARON LITTLE FRENCH, # 319091 | : | |
| | : | |
| v. | : | Civil No. CCB-11-2142 |
| | : | |
| MARYLAND DIVISION OF CORRECTION, *et al.* | : : | |
| _____ | : | |
| | : | |
| COREY LAMOND JAMES, # 246652 | : | |
| | : | |
| v. | : | Civil No. CCB-11-3301 |
| | : | |
| MARYLAND DIVISION OF CORRECTION, *et al.* | : : | |

**MEMORANDUM**

Aaron Little French and Corey Lamonde James, self-represented prisoners confined within the North Branch Correctional Institution ("NBCI") of the Maryland Division of Correction, filed civil rights actions pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"),[1] complaining that their religious practice has been unreasonably burdened during the Islamic holy month of Ramadan, when, as observant Muslims, they must fast from sunrise to sunset. French and James claim that defendants Department of Correction, Warden Bobby Shearin, and Chaplain Kevin Lamp (collectively "the DOC") have denied them nutritional religious accommodations, leading to a reduced calorie intake, and have not provided promised ritual feasts marking the end of Ramadan each year. They also complain that Muslims are denied a special religious diet such as is provided to Jewish

---

[1] French and James misidentify the relevant statutes pointing instead to the Religious Freedoms Restoration Act which was superseded by the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. A. §2000cc-1 *et seq.*. Their claims will be assessed under the correct statute.

inmates.[2]

The DOC has filed Motions to Dismiss, or in the Alternative for Summary Judgment, in each pending case, and they contain identical legal arguments and exhibits, with the exception of one exhibit and differing medical records depending on the plaintiff. French has not responded, but James has filed a response which will be considered adequate to resolve both plaintiffs' claims. After review of the pleadings and applicable law, the court determines that a hearing is unnecessary. *See* Local Rule 105.6 (D. Md. 2011). For the reasons set forth below, the DOC's motions to dismiss, construed as motions for summary judgment, will be granted.

## BACKGROUND

Maryland's religious diversity is evident even in the restrictive prison environment. Indeed, according to the DOC's Religious Services Program Policy and Procedures, Maryland recognizes thirty-three religious denominations and subgroups—from Buddhist and Roman Catholic to Neo-pagan and Rastafarian. (*See* Defs.' Mot., Ex. B (Stephanie Coates, DOC Director of Religious Services, Declaration ("Coates Decl.")), ECF No. 17-3, Appendix).[3]

In accommodating the religious practices of its inmates, the DOC takes religious nutritional requirements into account. In fact, the DOC's lacto-ovo dietary plan was developed in part in response to concerns of favoritism raised in a civil rights action filed on behalf of members of the Moorish Science Temple of America, an American religious group identifying

---

[2] The complaint was originally filed on behalf of French, four individually named inmates, and "all other Maryland prisoners similarly situated." The complaint was docketed as separate complaints for each individually named inmate and the inmates were directed to supplement the initial filings. *See James v. Maryland Division of Correction, et al.*, Civil Action No. CCB-11-3301 (D. Md. 2011); *Reid v. Maryland Division of Correction*, Civil Action No. CCB-11-3302 (D. Md. 2011); *White v. Maryland Division of Correction*, Civil Action No. CCB-11-3303 (D. Md. 2011); and *Gordan v. Maryland Division of Correction*, Civil Action No. CCB-11-3304 (D. Md. 2011). Only French and James proceeded with their cases. As the remaining claims of French and James raise similar issues the cases shall be consolidated for dispositive review.

[3] All record references are to the first captioned docket, Civil No. CCB-11-2142.

itself as part of Islam. (*See* Defs.' Mot., Ex. C (Williams, former DOC Director of Religious Services, Declaration ("Williams Decl.")), ECF No. 17-4, at ¶ 7); *see also Salaam v. Collins*, 830 F. Supp. 853 (D. Md. 1993). The plaintiffs in *Salaam* demanded meat slaughtered in the Islamic tradition, which some Islamic scholars consider an obligatory requirement of faith. The Moorish prisoners argued they were discriminated against because they had one religiously acceptable diet choice (the lacto-ovo diet) while Christians had two (a regular diet or the lacto-ovo diet). During the litigation, the five DOC Muslim chaplains were consulted and affirmed that the lacto-ovo diet provided was Halal—in compliance with Islamic religious dietary practices. (Williams Decl. at ¶ 7). They also indicated that ritual feasts were provided when institutional safety permits. (*Id.*). Summary judgment was entered in favor of the DOC defendants, finding no discrimination. *Salaam*, 830 F. Supp. at 861.

Nevertheless, the DOC took the prisoners' concerns seriously and have continued to offer nutritional accommodations to Muslim inmates. The DOC provides a lacto-ovo menu that meets Islamic religious requirements. (Defs.' Mot., Ex. D (Chaplain Lamp Declaration ("Lamp Decl.")), ECF No. 17-5, at ¶ 5). The DOC does not provide any group with meat slaughtered in accordance with religious dietary laws because the state is unable to afford a diet option for any religious group that includes ritually-slaughtered animals due to cost and practical limitations on prison storage, cooking, and serving capacities. (Coates Decl. at ¶ 7). The DOC also notes that two menus were offered to all prisoners; a lacto-ovo diet (which provides dairy products but no meat or fish) and the regular diet plan, containing meat but no pork or pork products. (Williams Decl. at ¶ 3). These options were designed to remove pork, which is offensive to both Muslim and Jewish prisoners. (*Id.*). If an inmate chooses to skip a meal for religious fasting, however, the

3

DOC does not promise that they will receive additional calories equal to the skipped meal. (Lamp Decl. ¶ 6).

In developing dietary offerings for its Muslim population, the DOC has consulted with Islamic religious and dietary leaders to ensure that the lacto-ovo diet complies with the requirements of Islamic dietary practice. DOC staff consulted the authoritative body overseeing Islamic food certifications, known as Halal certification, in April of 2011, to ensure that the DOC's Halal diets continued to meet the requirements of Islam. (Coates Decl. at ¶ 6). At that time, Islamic authorities were invited to visit any one of the DOC's facilities to examine the menu and food preparation area to ensure compliance with Islamic dietary practices. (*Id.*) The visiting authorities found the institution satisfactory. (*Id.*)

The DOC also provides a declaration from Dr. Brannan Wheeler, Director of the Center for Middle East and Islamic Studies and a history professor at the United States Naval Academy. (*See* Defs.' Mot., Ex. A ("Wheeler Decl."), ECF No. 17-2). According to Dr. Wheeler, Muslim jurists "carefully distinguish between the 'Sunnah' of the prophet Muhammad (the behaviors he established during his lifetime to be emulated by his followers), and the legal category of 'sunnah' (i.e., customary but non-mandatory) practices that might be derived from the Quran, Sunnah, or other sources." (Wheeler Decl. at ¶ 6). Dr. Wheeler explains that certain forbidden substances may be used for medicinal purposes (i.e., pork-derived insulin is legal for diabetics), (*id*. ¶ 9); the practice of vegetarianism is permitted and even seen as exemplary, (*id.* ¶ 10); and certain practices of Islam are not required, or even allowed, for certain social groups, such as prisoners, (*id.* ¶ 11)). Dr. Wheeler provides a detailed analysis of Muslim dietary practices and notes that dietary rules "are not supposed to be overly restrictive or burdensome upon Muslims" and states that "a relatively small number of general rules . . . , according to Muslim jurists, are

not to be followed in all of their specific details to their final logical conclusions. This approach to maintaining a Muslim diet is also the general attitude of the vast majority of practicing Muslims today." (*Id.* ¶ 12). Thus, foods containing small quantities of pork or pork-by-products, cheese, butter fat, sour cream, whey, glycerin, and lecithin are permitted, because "Islamic law does not prescribe this attention to detail . . . [and] specifically provides allowances for the consumption of foods technically not allowed . . . Muslim jurists do not expect Muslims to examine in minute detail all of the ingredients and the source of the ingredients included in their food and drink." (*Id.* at p. 17-19).

Stephanie Coates, Director of Religious Services for the DOC, states that, in addition to the lacto-ovo meal, Muslims are also provided one celebratory meal each year, usually for the observance of the holiday of Eid-al-Fitr, the ritual breaking of the Ramadan fast. (*Id.* ¶ 8). During the month of Ramadan, Muslims receive daily religious services and are permitted early morning meals and to fast during daylight hours. (*Id.*). They are also permitted to attend late meals or are provided "fasting bags" to consume in their cells after dark. (*Id.*). Muslim inmates are permitted Islamic clothing, prayer rugs and reading materials as well as other religious property. (*Id.*). Muslim chaplains are assigned to each region of the state. (*Id.*). If a particular facility lacks a Muslim chaplain, the administration may contact the regional chaplain for assistance. (*Id.*). According to Coates, it is the policy of the DOC to allow Muslim inmates the opportunity to exercise their religious beliefs to the fullest extent possible consistent with security and budgetary constraints. (*Id.*).

Chaplain Lamp attests that NBCI inmates received an Eid al-Fitr feast in 2009 and 2010. (Lamp Decl. at ¶ 3). In 2011, however, NBCI went on lockdown in late August for more than a week, during which all the inmates were locked within their tiers and received meals in their

cells. (*Id.* ¶ 4). Ramadan ended during the lockdown and it was therefore impossible for the Muslim inmates to gather for the traditional feast. (*Id.*). After the lockdown, the inmate representative for NBCI's Sunni Muslims was offered the opportunity to have a "makeup" feast at a later date but declined on behalf of the Muslim inmates. (*Id.*). Lamp also states that NBCI prisoners are provided early morning meals and after sunset meals during Ramadan, (*id.* ¶ 6), but he admits that they are not provided any additional calories in fasting bags. (*Id.* ¶ 9).

French and James dispute that inmates have received all of the accommodations cited by the DOC. First, they state that the Eid al-Fitr feast, although promised, has not always been provided to them. Specifically, James alleges that in 2008, when incarcerated at the Maryland Correctional Adjustment Center ("MCAC"), the traditional group feast marking the end of Ramadan was postponed from September 20, 2008 until October 31, 2008 due to damage in MCAC's kitchen. James was transferred from MCAC to NBCI on October 31, 2008, and did not personally partake in the feast. French and James also claim that meals in 2009 and 2010 designated as feasts were not "special" or different from the meals served the non-Muslim inmates. They also point to the denial of the 2011 feast due to the lockdown.

French and James further claim that their Ramadan fasting is not sufficiently accommodated. First, they state they have never received additional snacks or calories outside of regular mealtimes. Second, they admit that they are provided dinner after sunset, but complain that these meals are often delivered 30 minutes to an hour after sunset, exacerbating the difficulty in fasting. They also complain that they are not given additional calories to make-up for missing lunch during the day. They indicate that the failure to provide them the same number of calories as if they were not fasting adversely impacts their health, and that they lost substantial weight due to the fasting limitations. Their medical records, however, indicate that they have not lost

substantial weight or suffered adverse health effects as a result of their fasting during Ramadan. (*See* Defs.' Mot., Exhibit Medical Records, ECF No. 17-5 (Civil No. CCB-11-3301); ECF No. 17-6 (Civil No. CCB-11-2142)).

French and James have submitted a declaration from Markaz Tunstall, a fellow inmate and their Imam, who states that Sunni Muslim inmates at NCBI have never been provided "fasting bags" to eat at night during their Ramadan fast, never been provided Jumu'ah worship as a group (although they have been provided "splintered" Friday worship), and never been provided "special" food at meals designated as "feasts." (Pls.' Opp., Ex. 2 ("Tunstall Decl."), ECF No. 20-2, at ¶¶ 2, 4-9). Tunstall also disputes that, as the inmates' representative, he "declined" a make-up feast following lockdown in 2011. (*Id.* ¶¶12-13). Instead, because the dates of the feasts are vital to their religious practice, Tunstall states he requested that the make-up be a celebration of an alternative feast, Eid Al-Adha, but that this make-up was never provided. (*Id.* ¶¶ 13-14).

Finally, according to French and James, and undisputed by the DOC, the DOC developed an official Religious Diet Program in 2009. James requested to be provided a religious diet. Defendant Lamp denied James's request stating that "at this time the religious diet is for Jewish inmates only. The DOC does not offer an Islamic Diet or Muslim Diet. You would have to write headquarters to suggest such a diet." French and James argue that Muslims should be permitted to request a "religious" diet, an option currently available only to Jewish prisoners.

## STANDARD OF REVIEW

The DOC has moved to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. A court considers only the pleadings when deciding a Rule 12(b)(6) motion. Where the parties present matters outside of

the pleadings and the court considers those matters, as here, the motion is treated as one for summary judgment. *See* Fed. R. Civ. P. 12(b); *Gadsby by Gadsby v. Grasmick,* 109 F.3d 940, 949 (4th Cir. 1997); *Paukstis v. Kenwood Golf & Country Club, Inc.,* 241 F. Supp. 2d 551, 556 (D. Md. 2003). The parties, however, "shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed. R. Civ. P. 12(b). The requirement of "reasonable opportunity" means that all parties must be provided with notice that a Rule 12(b)(6) motion may be treated as a motion for summary judgment, which can be satisfied when a party is "aware that material outside the pleadings is before the court." *Gay v. Wall,* 761 F.2d 175, 177 (4th Cir. 1985); *see also Laughlin v. Metro. Washington Airports Auth.,* 149 F.3d 253, 261 (4th Cir. 1998) (commenting that a court has no obligation "to notify parties of the obvious").

The plaintiffs had adequate notice that the defendants' motion might be treated as one for summary judgment. The motion's alternative caption and attached materials are in themselves sufficient indicia. *See Laughlin*, 149 F.3d at 260-61. Moreover, James referred to the motion in his opposition brief as one for summary judgment and submitted additional documentary exhibits. Therefore, the court will consider the affidavits and additional materials submitted by the parties and will treat the motion of the defendants as a motion for summary judgment.[4]

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has clarified

---

[4] French was notified on April 19, 2012 that the DOC had filed a dispositive motion, the granting of which could result in the dismissal of his action, as required by *Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir. 1975). (*See* ECF No. 18, Civil No. CCB-11-2142). French sought and was granted an extension of time to respond to the dispositive motion (ECF Nos. 24 & 25), but to date has filed nothing further. As noted above, because French and James filed identical complaints, James's opposition will be considered in assessing the motion to dismiss French's claim as well.

that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Whether a fact is material depends upon the substantive law. *See id.*

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion,'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration in original) (quoting *United States v. Diebold*, 369 U.S. 654, 655 (1962)), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotation marks omitted).

## ANALYSIS

French and James provide no factual basis to hold defendants Shearin or Lamp individually liable. They have adduced no evidence that either defendant was personally responsible for any of the alleged violations or intentionally deprived the plaintiffs of their right to practice their religion. *See Lovelace v. Lee*, 472 F.3d 174, 194-96 (4th Cir. 2006). They also have not demonstrated that either defendant is subject to individual supervisory liability based on the conduct of other DOC employees implementing prison policy or the creation of DOC policy

itself. *See Shaw v. Stroud*, 13 F.3d 791, 798-99 (4th Cir. 1994). Accordingly, all claims against the named defendants in their individual capacities will be dismissed.

French and James also cannot bring claims for money damages against the DOC itself or its officers in their official capacities, under either § 1983 or RLUIPA, because the DOC is a state agency and such actions are barred by the Eleventh Amendment. *See Will v. Michigan Dept. of State Police*, 491 U.S. 58, 63-64 (1989) (§ 1983); *Madison v. Virginia*, 474 F.3d 118, 130-32 (4th Cir. 2006) (RLUIPA). Nevertheless, because French and James are permitted to bring claims for prospective declaratory and injunctive relief against Warden Shearin, in his official capacity as warden, to enforce their religious practice rights, *see Will*, 491 U.S. at 89-90; *Madison*, 474 F.3d at 130-31, each of their claims will be addressed below.

    **A.**    **RLUIPA and Free Exercise Clause Claims**

In 1993, Congress passed the Religious Freedom Restoration Act ("RFRA"), which stated that the "[g]overnment may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *See* 42 U.S.C. § 2000bb-1(b) (1994). The United States Supreme Court subsequently declared RFRA unconstitutional on grounds that Congress had exceeded its powers under Section 5 of the Fourteenth Amendment. *See City of Boerne v. Flores*, 521 U.S. 507, 536 (1997). In response, Congress enacted the Religious Land Use and Institutionalized Persons Act ("RLUIPA") in 2000, which states:

> No government shall impose a substantial burden on the religious exercise of a person residing or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive

means of furthering that compelling governmental interest." *See* 42 U.S.C. § 2000cc-1(a).[5]

RLUIPA does not give prisoners an unfettered right to religious accommodation. Rather, the statute mandates "due deference to the experience and expertise of prison and jail administrators." *Lovelace*, 472 F.3d at 189-90 (quoting *Cutter v. Wilkinson,* 544 U.S. 709, 723 (2005)). Plaintiffs bear the burden of persuasion on whether the policy or practice substantially burdens their exercise of religion. *See* 42 U.S.C. § 2000cc-2(b). RLUIPA defines the term "religious exercise" broadly to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-(7)(A).

If plaintiffs satisfy this requirement, the government must then prove that the challenged policy is the least restrictive means of furthering a compelling governmental interest. *Id.* § 2000cc-1(a); *Smith v. Ozmint*, 578 F.3d 246, 250 (4th Cir. 2009); *see also Couch v. Jabe*, 679 F.3d 197, 200 (4th Cir. 2012). "As to those elements on which it bears the burden of proof, a government is only entitled to summary judgment if the proffered evidence is such that a rational fact finder could only find for the government." *Smith*, 578 F.3d at 250.

French and James allege two potential burdens on their exercise of their faith. First, they allege that DOC policies and practices concerning Ramadan fasting—the timing of their meals and availability of additional calories during times when they are permitted by their religion to eat—burdens their ability to fast. Second, they allege that, for various reasons, they have, on several occasions, been denied the ritual Eid al-Fitr feast following Ramadan and any "make-up" feast in years that the DOC acknowledges it was denied.

---

[5] The language of RFRA and RLUIPA is nearly identical; thus, cases evaluated under RFRA are still persuasive regarding the standards for a "substantial burden" as well as the "least restrictive means of furthering a compelling state interest."

11

First, under RLUIPA, a "substantial burden" is "one that 'puts substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Lovelace*, 472 F.3d at 187 (quoting *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 718) (1981)) (alteration omitted). French and James have not shown they have been burdened—or in any way hindered—in their fasting during Ramadan. Their claims that the DOC has not provided sufficient calories to them during Ramadan has no factual basis. The DOC has a set of policies in place to support an inmate's choice to fast and NBCI has provided such accommodations. (*See* Lamp Decl. at ¶¶ 6, 8-9). For example, French and James's own submissions demonstrate that they are provided meals after sunset—when they are permitted to eat during Ramadan. Their substantial burden claim in this regard rests on an allegation that "the distribution of night meals . . . can range from 30 minutes until an hour after sunset[.]" (Complaint ¶ 22). Waiting an hour to eat a meal after fasting all day may be uncomfortable, but this allegation concerning the "distribution" of such accommodating meals confirms that the DOC follows through on its promise to ensure Muslim inmates are able to fast. The court does not doubt that fasting, which includes the skipping of meals during the day, may lead to some weight loss or the intake of fewer calories relative to non-fasting inmates, but those are anticipated effects of the practice of fasting. So long as these effects have no impact on health and they otherwise do not interfere with an inmate's ability to fast, as they have not done here (based on French and James's admission that they have been able to fast during Ramadan each year), nothing in the record indicates the DOC in any way burdened French or James's practice of fasting.

Second, assuming that a policy or ongoing practice of denying Eid al-Fitr ritual feasts could be a substantial burden on an inmate's exercise of his or her Muslim faith, the DOC has demonstrated here that the specific instances where French and James were denied such a feast

were the least restrictive means of furthering a compelling governmental interest. Although French and James have submitted evidence stating that when NBCI inmates have been given an Eid al-Fitr feast it has not been "special," they have not adduced evidence disputing Chaplain Lamp's statement that the Muslim inmates were given an Eid al-Fitr feast in 2009 and 2010. (Lamp Decl. ¶3; p. 5 (a memo attached to Lamp's declaration indicating staff schedules were adjusted in 2010 for an Eid al-Fitr feast). Accordingly, French and James allege no substantial burden based on a denial of a feast in 2009 or 2010.

But, the DOC does admit that James was denied the feast in 2008 because he was being transferred on the day of the feast, and the DOC admits that both plaintiffs were denied the feast in 2011, because the prison was on lockdown. In 2008, two unfortunate circumstances led to James missing the Eid al-Fitr feast. First, his prison's kitchen was damaged, so the feast was rescheduled. On the day for which it was rescheduled, James was scheduled to be transferred to NBCI. James does not dispute the DOC's justification for his missing the 2008 feast, and he does not claim that the DOC ignored any possible alternative. Accordingly, it is clear from the record that the DOC's one-time action denying James's ritual feast in 2008 did not violate James's religious exercise rights under RLUIPA.

Similarly, French and James do not dispute that they were denied the 2011 feast because the prison was on lockdown when it was scheduled. Prisoner safety and security is the DOC's paramount concern, *see Lovelace*, 472 F.3d at 190, and there is no evidence to dispute the DOC's assertion that the 2011 lockdown was a necessary action. Although RLUIPA affords inmates broad religious practice rights, it does not outweigh genuine prisoner safety and security needs. Thus, DOC's 2011 lockdown also was not a violation of the statute.

To the extent that French and James premise their claims on the denial of a "make-up" feast for the years they did not receive one, the declaration of their Imam, attached to their opposition brief, specifically acknowledges that the dates of ritual feasts are important , (*see* Tunstall Decl. at ¶ 12), undermining the notion that the denial of a make-up feast, though disappointing, would substantially burden the exercise of their religion. It is apparent that the DOC takes Ramadan and the Eid al-Fitr feast seriously, and it provides accommodations for these practices as extensively as possible. French and James are entitled to no relief under RLUIPA.

Furthermore, because, for the most part, "a statutory violation under RLUIPA involves the same threshold issues as invoked by the Free Exercise Clause[,]" French and James's Free Exercise Clause claims also fail as a matter of law. *See Brown v. Ray*, 695 F. Supp. 2d 292, 299 (W.D. Va. 2010); *see also Lovelace*, 472 F.3d at 186 (noting that in RLUIPA, Congress mandated "a more searching standard of review of free exercise burdens than the standard used in parallel constitutional claims: strict scrutiny instead of reasonableness.") (internal quotation marks omitted).

**B. Establishment Clause and Equal Protection Claims**

To the extent that James and French have stated Establishment Clause or equal protection claims on the alleged preference DOC gives to Jewish prisoners over Muslim prisoners (by providing expressly "Kosher" meals while accommodating Muslim inmates with meals not expressly labeled "Halal"), virtually identical claims by other inmates have previously been considered and rejected by this court because they are largely semantic. *See Turner-Bey v. Maynard*, 2012 WL 4327282, at *9-10 (D. Md. Sept. 18, 2012).[6] While a religious

---

[6] Unpublished cases are cited for the soundness of their reasoning, not for any precedential value.

accommodation granted an inmate under RLUIPA *could* run afoul of the Establishment Clause where it "single[s] out a particular religious sect for special treatment," *see Cutter v. Wilkinson*, 544 U.S. 709, 723-24 (2005) (citation omitted), here, the DOC is not providing "special treatment" to Jewish inmates. Practitioners of both religions receive appropriate dietary accommodations. (*See, e.g.*, Williams Decl. at ¶¶12-13; Coates Decl. at ¶ 7). Neither religious group, for example, is provided ritually slaughtered meat—both are offered only lacto-ovo diets as an accommodation. (Coates Decl. at ¶ 7). The mere fact that the accommodation of Jewish inmates, due to food preparation requirements, may necessitate a specifically labeled diet does not undermine the substantial evidence in the record that the DOC's lacto-ovo diet equally conforms to the dictates of Halal. (*See* Coates Decl. at ¶ 6); *see also Turner-Bey*, 2012 WL 4327282 at *10 n.46.

Similarly, setting aside the special considerations of an equal protection claim in the prison context, *see Morrison v. Garraghty*, 239 F.3d 648, 655-56 (4th Cir. 2001), French and James have not alleged any unequal treatment sufficient to mount such a claim. *See Turner-Bey*, 2012 WL 4327282 at *10. The only significantly "different" treatment alleged in either complaint is the transfer of James that caused him to miss the ritual Eid al-Fitr meal in 2008, but James does not dispute that the transfer was based on a valid penological interest and was a one-time impediment to an otherwise ongoing religious accommodation. Accordingly, the DOC is entitled to summary judgment on French and James's Establishment Clause and equal protection claims.

## CONCLUSION

For the above stated reasons, the DOC's motion to dismiss or, in the alternative, for summary judgment, will be granted.

A separate Order follows.

_____3/15/13_____                        _____/s/_____
Date                                               Catherine C. Blake
                                                   United States District Judge